# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# LAFAYETTE DIVISION

| | | |
|---|---|---|
| RUSSELL CONNOR | * | CIVIL ACTION NO. 12-1566 |
| VERSUS | * | JUDGE DOHERTY |
| COMMISSIONER OF SOCIAL SECURITY | * | MAGISTRATE JUDGE HILL |

## REPORT AND RECOMMENDATION

This social security appeal was referred to me for review, Report and Recommendation pursuant to this Court's Standing Order of July 8, 1993.  Russell Connor, born June 20, 1962, filed an application for a period of disability and disability insurance benefits on November 14, 2009, and supplemental security income on September 8, 2010, alleging disability as of September 5, 2009, due to a cracked skull.

## FINDINGS AND CONCLUSIONS

After a review of the entire administrative record and the briefs filed by the parties, and pursuant to 42 U.S.C. § 405(g), I find that there is not substantial evidence in the record to support the Commissioner's decision of non-disability.

In fulfillment of F.R.Civ.P. 52, I find that the Commissioner's findings and conclusions regarding claimant's disability is not supported by substantial

evidence, based on the following:

**(1) Records from Dr. Wayne Lindemann dated September 8-14, 2009**.

Claimant sustained a left frontoparietotemporal acute epidural hematoma with left to right midline shift after falling off of a ladder while trimming tree branches on September 5, 2009.  (Tr. 174).  He was admitted to Lafayette General Medical Center, where Dr. Patrick Juneau performed a craniotomy with evacuation of hematoma.  (Tr. 202).  He was placed on Keppra for seizure prophylaxis, but did not have any seizure activity.  (Tr. 174).  He also sustained an avulsion to the right third digit, which was treated with localized wound care to the skin.

On examination on September 14, 2009, claimant was alert and oriented to person, place, and year, moving all extremities well.  His scalp incision was healing fine.  He was able to ambulate without any assistance or assistive devices. His was discharged and prescribed Keppra and Chromagen Forte.

**(2) Records from Dr. Kenneth Odinet dated September 25, 2009 to**

**October 27, 2009**.  On September 25, 2009, Dr. Odinet performed a Stage 1 cross finger flap to the right middle finger and full thickness skin grafting to the right ring finger.  (Tr. 250).

Dr. Odinet performed a release and inset cross finger flap in the middle finger and debridement 3 centimeter complex repair of the ring finger on October

2

12, 2009.  (Tr. 222).

On October 27, 2009, Dr. Odinet reported that claimant was doing well.

(Tr. 279).  He had full range of motion of all digits.  His cross finger flap had

healed well.

**(3) Records from Dr. Patrick Juneau, III dated September 5, 2009 to**

**July 23, 2010**.  On October 2, 2009, Dr. Juneau reported that claimant was totally

awake and alert, and his speech was fluent.  (Tr. 264).  His left scalp was sunken

in and not under any pressure.

On May 11, 2010, Dr. Juneau performed a left-sided cranioplasty.  (Tr.

323).  He reported on July 23, 2010, that claimant's wound had healed up nicely,

and he was doing well.  (Tr. 325).

**(4) Consultative Examination by Dr. Kenneth A. Ritter, Jr. Dated**

**February 2, 2010**.  Claimant complained of a "cracked skull" and seizures.  (Tr.

296).  He had never suffered a seizure, but was given prophylactic treatment

because of his head injury.  His medicines included Aspirin only.  He was

supposed to be on Keppra for prophylaxis for seizures, but reported that he never

filled it because he could not afford it.

On examination, claimant was 5 feet 5 inches tall and weighed 118 pounds.

(Tr. 297).  His visual acuity without glasses was 20/70.  His left skull was

3

somewhat depressed from the injury.  Neurologically, claimant was intact with normal DTRs, strength, and sensation.

Dr. Ritter's impression was that claimant had apparently suffered a head injury with a fractured skull in September of 2009.  (Tr. 298).  Claimant stated that he was supposed to have a plate placed on his skull sometime in the future.  His only complaint was that he got a headache when he looked up or down too much.

In the Medical Assessment of Ability to do Work-Related Activities (Physical), Dr. Ritter checked that claimant's ability to lift/carry, stand/walk, and sit were not affected by his impairment.  (Tr. 299).  He could perform all postural activities frequently.

**(5) Consultative Psychological Examination by Dr. Eric Cerwonka dated April 10, 2010**.  Claimant's chief complaint was a cracked skull.  (Tr. 303). He reported that he used to drink heavily before his injury.  (Tr. 304).  He denied the use of any psychotropic medications.

Claimant stated that although he was not aware of it, he also suffered from seizures.  Additionally, he said that he suffered from severe headaches.  His medications included Hydrocodone as needed, and Levetiracetam for seizures.

On examination, claimant's mood appeared to be euthymic, but his affect was restricted.  His thinking was organized and goal-directed with no evidence of

4

loose associations, tangential, or circumstantial thought processes.  He was alert and oriented as to person, place, time, and situation.

Claimant's comprehension was good, and fund of general knowledge seemed good.  His remote memory was intact, and demonstrated recent memory was good.  His attention and concentration skills were intact.

Pace and persistence were fairly good.  Insight and judgment appeared to be fair.  (Tr. 305).

Claimant reported that he was capable of standing, sitting, walking, light lifting, bathing, grooming, dressing, shopping, cooking, and some household chores.  He reported that he was able to drive, but only had a learner's permit.

Administration of the Wechsler Adult Intelligence Scale, Fourth Edition, revealed a full scale IQ score of 63, verbal IQ of 68, and performance score of 71, which placed claimant's overall level of intellectual functioning in the deficient range.  (Tr. 306).  Dr. Cerwonka opined that these scores mildly underestimated his true intellectual functioning, and that his true FSIQ was likely to be in the mid-borderline range.  Nonetheless, he found that this most likely represented a mild decrease from his pre-morbid intelligence, which was estimated to have been in the high borderline/low average range.  He determined that claimant's current

level of intellectual functioning would not be expected to prevent him from working.

Dr. Cerwonka also administered the Wechsler Memory Scale, Third Edition, in which claimant achieved scores in the borderline range.  (Tr. 306-07).  He noted that this decrease was similar in magnitude to the decrease noted in claimant's overall intellectual functioning.  (Tr. 307).  He opined that claimant had suffered a mild decrease in his overall memory; however, this decrease would not be expected to prevent him from working.

Dr. Cerwonka's diagnostic impression was cognitive disorder, NOS (very mild), borderline intellectual functioning, and history of TBI.  Claimant's Global Assessment of Functioning ("GAF") score was 68.

In conclusion, Dr. Cerwonka stated that it was unlikely that claimant suffered from any of the more classic Axis I disorders.  He reported that there were no signs of an anxiety disorder.  (Tr. 308).  He also said that claimant had no intellectual limitations or cognitive deficits that would be expected to prevent him from working.

Additionally, Dr. Cerwonka noted that during the examination, claimant was able to understand, retain, and follow instructions, and able to sustain enough concentration and attention to perform both simple and more complex tasks.  He

6

also found that claimant seemed to be able to relate well to others on a one-to-one basis.  He concluded that, as such, there did not seem to be any psychiatric, cognitive, or behavioral problems that would prevent claimant from engaging in regular, full-time work.

**(6) Records from VMAC dated July 27, 2010 to January 10, 2011**.  On July 27, 2010, claimant presented with a history of a skull fracture, and wished to establish in the VA clinic.  (Tr. 363).  A depression screen was negative.  (Tr. 367).  A PTSD screen was negative.  (Tr. 368).

On September 20, 2010, claimant stated that he was having anger management issues.  (Tr. 362).  He reported that he was quick-tempered, had no patience, and was "mad all the time."  He agreed to make an appointment with a social worker.

On September 21, 2010, claimant presented with symptoms of volatile temper and being easily frustrated, irritated, restless, and easily started since a head injury in 2009.  (Tr. 360).  His mood was euthymic, and affect was restricted. (Tr. 361).  His GAF score was 55.

Claimant's diagnosis was depression.  The plan was group therapy with medication evaluation.

On September 22, 2010, claimant saw Dr. Michelle Simon for worsening in his mood/temper since his accident one year prior.  (Tr. 359).  He complained of mood swings, irritability, a hard time having a conversation with others, poor sleep, occasional headaches, and trouble with memory from the time of his accident.  He had been placed on seizure medications for the year following his injury, but it was being discontinued.

On examination, claimant described himself as irritable.  (Tr. 360).  His memory appeared intact, but fund of knowledge was low.  He had very concrete thinking.  Judgment/insight was limited.

Dr. Simon's assessment was a history of mood disorder secondary to head injury, probable pre-morbid personality disorder.  (Tr. 360).  His GAF score was 45-50.[1]  He was prescribed Topiramate to help with mood swings.  (Tr. 330; 349-50).

On October 20, 2010, claimant presented late to session because he had difficulty finding a ride.  (Tr. 356).  He reported bouts of extreme irritability and anger.  The plan was group therapy to improve coping skills.

---

[1]A GAF score of 41–50 reflects serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job). DSM–IV at 34.  *Mayes v. Astrue*, 2012 WL 5925439 (W.D. La. Sept. 28, 2012).

On November 4, 2010, claimant expressed his desire to come to group, but stated that he had missed for a couple of weeks because of his angry mood.  (Tr. 355).

On November 8, 2010, claimant reported that he isolated himself to keep from getting into confrontations with people.  (Tr. 361).  He thought people intentionally tried to upset him.  He admitted to some pre-morbid problems with depression, possibly drinking, and irritability.  The diagnoses were depression, tobacco dependence, and r/o cluster A personality disorders.  (Tr. 362).

On November 17, 2010, claimant presented to session late.  (Tr. 353).  He shared his recent irritability and its effect on his attendance to the group.  The plan was group therapy to teach anger management and impulse control.

On December 21, 2010, claimant's mood was depressed, his affect was flat, and his thought process/content was intact with ruminations.  (Tr. 343).

**(7) Claimant's Administrative Hearing Testimony**.  At the hearing on January 3, 2011, claimant was unrepresented.[2]  (Tr. 24).  The following colloquy regarding his right to representation transpired:

> ALJ:  Now before I begin the substance of this morning's hearing, I must insure on the record that you understand your rights to

---

[2]Claimant signed a Waiver of Representation by the Claimant prior to the hearing.  (Tr. 91 ).

representation.  You have a right to be represented by an attorney, or a non-attorney.  A representative can help you obtain information about your claim, submit evidence, explain medical terms, help protect your rights, and making your request to give me notice about the proceedings before me.  A representative may not charge a fee or receive a fee unless I approve it.

If you appoint a representative, you may be responsible for certain expenses such as obtaining and/or copying medical records.  Some legal service organizations offer legal representation free of charge if you satisfy the qualifying requirement of that organization.

You also have a right to proceed without a representative.  If you do so, I will obtain the relevant medical and non-medical records and question you at the hearing.  Nevertheless, a representative can present your evidence in a way that is most favorable to your case.

Do you understand your rights to representation?

CLMT:      Yes, Sir.

ALJ:       Understanding your rights to representation, do you wish to proceed with or without a representative?

CLMT:      Without them.

ALJ:       Without a representative?

CLMT:      (No audible response).

ALJ:       And I have before me a written waiver of right to representation which provides in part that I have been informed, and I understand my right to representation by either an attorney or a non-attorney in accordance with the rules and regulation of the Social Security Administration, and I do hereby voluntarily waive that right and wish to proceed with the hearing on this date,

10

and it is signed January 3rd, 2011.  It is signed Russell
Lee Connor.
Now, Mr. Connor, is that the manner in which you wish
to proceed?

CLMT:      Yes, Sir, I guess.

ALJ:      Very well.  We'll proceed accordingly.

(Tr. 24-26).

Claimant testified that he was 48 years old.  (Tr. 29).  He stated that he was 5 feet 5 inches tall, and weighed 135 pounds.  He had a GED, and had attended junior college for electronics, but did not receive a certificate.  (Tr. 30).  He had also served in the National Guard from 1987 to 1990, and was activated into the Army for Operation Desert Storm from 1990-1991.  (Tr. 33).

Regarding work history, claimant confirmed that he worked as a shelf stocker during 1994 and 2008.  (Tr. 31).  He also worked as a palletize operator for a newspaper, a warehouse assistant, and in maintenance for the parish government.  (Tr. 31-32).  He had last worked in 2009 on the government's grass-cutting crew.  (Tr. 32).

Claimant testified that he could not return to work because of the stress.  (Tr. 32).  He stated that "the mood I be in, and it's I would probably, I mean, would probably get fired off a job as soon as I step on the job."  (Tr. 32).  He

11

reported that he was going to the VA once a week for anger management counseling.  (Tr. 33, 40).  He said that he missed class a lot because he got frustrated sometimes and became too upset to come.  (Tr. 40).

Claimant reported that he was injured at work in September, 2009.  (Tr. 36). He said he sustained finger damage and a cracked skull.  He stated that he was taking a "mind relaxing pill," cholesterol pills, and an antibiotic.  (Tr. 37).

As to activities, claimant testified that he was able to dress and groom himself.  He stated that he sometimes got dizzy from standing and had to sit down. He said that he tried not to pick up "too much heavy stuff."  (Tr. 38).  He reported that he basically stayed next door at his brother's house and watched TV, then went home at night and went to bed.  (Tr. 39).

Claimant testified that his sister-in-law had mentioned that he got "angry quicker" since the accident.  (Tr. 40).  He stated that he did not hang around a lot of people any more.  He said that he did not like "noise and people fussing and arguing."

### (8) Administrative Hearing Testimony of Danielle Rhodes, Vocational Expert ("VE").  Ms. Rhodes described claimant's past work as a grounds keeper as unskilled and medium; a palletize operator as unskilled and medium, a stocker as semi-skilled and heavy, and a warehouse stocker as unskilled and medium.  (Tr.

12

43).  The ALJ posed a hypothetical in which he asked the VE to assume a claimant of the same age, education, and work experience, who retained the residual functional capacity for light work.  In response, she testified that he could not perform his past work, but could work as a laborer, non-construction, of which there were 10,500 jobs statewide and 685,000 nationally; janitor/cleaner, of which there were 2,900 statewide and 192,000 nationally, and assembler, of which there were 4,100 jobs statewide and 737,000 nationally.  (Tr. 44).

The ALJ modified the hypothetical to assume a claimant of the same age, education, and work experience, who was limited to light work with the ability to alternate sitting and standing to relieve pain and discomfort; was limited to frequent climbing, balancing, stooping, kneeling, crouching, and crawling; had to avoid exposures to heat and hazards involving machinery and heights, and required jobs with only one- or two-step procedures and instructions learned by short demonstrations all less than 30 days.  (Tr. 45).  In response, the VE testified that he could not do his past work or the three positions identified.  However, she stated that he could work as a security guard, of which there were 5,100 positions statewide and 126,000 nationally; information clerk, of which there were 1,200 jobs statewide and 18,000 nationally, and counter clerk, of which there were 1,800 jobs statewide and 179,000 nationally.

Finally, the ALJ posed a hypothetical in which he asked the VE to assume a claimant of the same age, education, and work experience, who was limited to light work and had impairments which caused him to withdraw from the workstation at unscheduled times at a rate more often or for periods longer than a normal work break or lunch period allowed, and the absence caused him not to complete the work task in a timely manner or meet the demands of quantity or quality, and caused interference in concentration, persistence, and pace which prevented him from meeting the standard of quantity or quality associated with competitive employment.  (Tr. 45-46).  In response, Ms. Rhodes testified that he could not perform his past work or any other jobs that existed in the local, regional, or national economy.  (Tr. 46).

**(9) The ALJ's Findings**.  Claimant argues that: (1) the ALJ did not satisfy his "heightened duty" to an unrepresented claimant; (2) the ALJ erred, as a matter of law, in determining that claimant had not received counseling or psychotropic medications for his condition, and (3) the vocational expert's testimony did not constitute "substantial evidence," as it was given in response to a hypothetical scenario that did not fully incorporate his problems and limitations.  Because I find that the ALJ failed to properly consider claimant's mental residual functional capacity, I recommend that this matter be **REMANDED**  for further proceedings.

14

As to the first argument, it is well established that the ALJ owes a duty to a claimant to develop the record fully and fairly to ensure that his decision is an informed decision based on sufficient facts. *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996).  When a claimant is not represented by counsel, the ALJ owes a heightened duty to "scrupulously and conscientiously probe into, inquire of, and explore for all relevant facts." *Id*. (*citing Kane v. Heckler*, 731 F.2d 1216, 1219 (5th Cir. 1984)).  However, to merit reversal of the ALJ's decision, a claimant who does not validly waive his right to counsel must prove that he was thereby prejudiced. *Id*.; *Gullett v. Chater*, 973 F.Supp. 614, 621 (E.D. Texas 1997). Prejudice can be established by showing that additional evidence would have been produced if the ALJ had fully developed the record, and that the additional evidence might have led to a different decision. *Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir. 2000).

Here, claimant argues that he was prejudiced by the ALJ's failure to develop the record as to his adjustment difficulties with other people.  He notes that the ALJ had discredited his testimony that he had been attending counseling at the VA and had been taking psychotropic medications for his difficulties, finding "no medical evidence" and "no records" to support these contentions.  (Tr. 15).

However, the records from the VA specifically show that claimant was undergoing counseling for his anger problems and was taking medications for his mental issues.

While the Commissioner acknowledges that the ALJ "misstated" in his opinion that "there are no records indicating that psychotropic medications have been prescribed to control these alleged symptoms," she argues that any such error was "harmless" because the evidence does not support claimant's allegations that his anger and mood swings were disabling.  [rec. doc. 7, p. 9].  However, the records from the VA regarding claimant's mental condition are dated after Dr. Cerwonka's consultative evaluation upon which the ALJ relies.  (Tr. 14-15).  There is no indication that the ALJ even reviewed the VA's records concerning claimant's mental condition.

The records from the VA indicate that claimant's mental condition was ongoing.  On September 20, 2010, claimant stated that he was having anger management issues.  (Tr. 362).  He reported that he was quick-tempered, had no patience, and was "mad all the time."

On September 21, 2010, claimant presented with symptoms of volatile temper and being easily frustrated, irritated, restless, and easily startled since his head injury in 2009.  (Tr. 360).   His diagnosis was depression.  (Tr. 361).

16

On September 22, 2010, claimant complained of mood swings, irritability, having a hard time conversing with others, poor sleep, occasional headaches, and trouble with memory since the time of his accident. (Tr. 359). Dr. Simon's assessment was a history of mood disorder secondary to head injury, probable pre-morbid personality disorder. (Tr. 360). Claimant's GAF score was 45-50, which indicated serious symptoms or serious impairment. DSM–IV at 34. He was prescribed Topiramate to help with mood swings. (Tr. 330; 349-50).

On October 20, 2010, claimant reported bouts of extreme irritability and anger. (Tr. 356). On November 4, 2010, claimant expressed his desire to come to group, but believed it was better to have missed a couple of weeks because of his angry mood. (Tr. 355).

On November 8, 2010, claimant reported that he isolated himself to keep from getting into confrontations with people. (Tr. 361). He thought people intentionally tried to upset him. His diagnosis was depression, r/o cluster A personality disorders. (Tr. 362).

On November 17, 2010, claimant shared his recent irritability and its affect on his attendance to the group. (Tr. 353). The plan was group therapy to teach anger management and impulse control. On December 23, 2010, claimant's mood

was depressed, his affect was flat, and his thought process/content was intact with ruminations.  (Tr. 343).  He was prescribed Topiramate for mood swings through September, 2011.  (Tr. 330).

Contrary to the ALJ's statement, the records from claimant's treating sources at the VA show that claimant received treatment for his mental condition. It is well established that the opinion of a treating physician who is familiar with the claimant's impairments, treatments and responses, should be accorded great weight in determining disability.  *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000); *Leggett v. Chater*, 67 F.3d 558, 566 (5th Cir. 1995); *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994), *cert. denied*, 514 U.S. 1120, 115 S.Ct. 1984, 131 L.Ed.2d 871 (1995).

A treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with . . . other substantial evidence."  *Newton,* 209 F.3d at 455.

Good cause for abandoning the treating physician rule includes disregarding statements by the treating physician that are brief and conclusory, not supported by medically accepted clinical laboratory diagnostic techniques, or otherwise unsupported by evidence.  *Leggett*, 67 F.3d at 566; *Greenspan*, 38 F.3d at 237.

18

Here, there is no indication what weight, if any, that the ALJ gave to the records from claimant's treating physicians at the VA regarding his mental condition since he failed to mention them whatsoever.  These records, if reviewed, could have had an effect on the outcome of the ALJ's decision.  Accordingly, the undersigned finds that this case should be remanded for an opinion regarding claimant's mental RFC in light of these records from the VA.

Next, claimant argues that the ALJ erred in failing to include in the hypotheticals to the vocational expert any limitations caused by claimant's adjustment difficulties in dealing with other people.  Again, claimant reported this problem to his treating physician at the VA.

In *Bowling v. Shalala*, 36 F.3d 431 (5th Cir.1994), the Fifth Circuit stated its test for determining when a defective hypothetical question will produce reversible error:

> Unless the hypothetical question posed to the vocational expert by the ALJ can be said to incorporate reasonably all disabilities of the claimant recognized by the ALJ, and the claimant or his representative is afforded the opportunity to correct deficiencies in the ALJ's question by mentioning or suggesting to the vocational expert any purported defects in the hypothetical questions . . . a determination of non-disability based on such a defective question cannot stand.

*Boyd v. Apfel,* 239 F.3d 698, 707 (5th Cir. 2001) (*quoting Bowling*, 36 F.3d at 436).

Here, the ALJ, in formulating his hypotheticals, failed to include the limitations as to claimant's mood disorder.  This constitutes error.  On remand, claimant's limitations from his mood disorder and difficulties in dealing with people should be addressed in his residual functional capacity assessment.

Accordingly, the undersigned recommends that this case be **REMANDED** to the Commissioner for further administrative action pursuant to the fourth sentence of 42 U.S.C. § 405(g).  This includes, but does not limit, sending the case to the hearing level with instructions to the Administrative Law Judge to reassess claimant's mental residual functional capacity.  Claimant shall be afforded the opportunity to submit additional evidence, and to testify at a supplemental hearing with vocational expert testimony, if the Administrative Law Judge deems it necessary after the RFC determination on remand.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have fourteen (14) business days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN FOURTEEN (14) DAYS FOLLOWING THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT, EXCEPT UPON GROUNDS OF PLAIN ERROR.  *DOUGLASS V. UNITED SERVICES AUTOMOBILE ASSOCIATION*, 79 F.3D 1415 (5TH CIR. 1996).**

Signed May 28, 2013, at Lafayette, Louisiana.


_____
C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE


Copy sent:  RFD
On:  5/28/2013
By:  MBD

21